UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


EDWARD FRANK LINT,

               Petitioner,

v.                               CASE NO. 09-10044
                               HONORABLE GEORGE CARAM STEEH

JOHN PRELESNIK,

               Respondent.
_____/

## OPINION AND ORDER
## DENYING THE HABEAS PETITION AND
## GRANTING IN PART A CERTIFICATE OF APPEALABILITY

      Petitioner Edward Frank Lint has applied for the writ of habeas corpus pursuant

to 28 U.S.C. § 2254.  The habeas petition challenges petitioner's convictions for

kidnaping by secret confinement and malicious destruction of property over $1,000.

Petitioner alleges that:  (1) there was insufficient evidence to support the jury's verdict

on the kidnaping charge; (2) the admission of "other acts" evidence deprived him of due

process; (3) trial counsel was ineffective and the state courts erred by rejecting his

claims without holding an evidentiary hearing; (4) the exclusion of a letter containing the

complainant's signature deprived him of his right to present a defense; and (5) the

prosecutor's misconduct deprived him of due process.  The Court finds no merit in these

claims.  Accordingly, the habeas petition is denied.  The reasons follow.

### I. Background

### A.  Facts

      Petitioner was charged in Macomb County, Michigan with kidnaping, malicious

destruction of personal property worth at least $1,000, but less than $20,000, and two counts of criminal sexual conduct in the first degree. The charges arose from allegations that, in November of 2003, petitioner confined his wife (Maja Lint) in their apartment, sexually penetrated her using force or coercion, and damaged an attic wall in their apartment building while attempting to elude the police. The state court summarized the facts as follows:

> [S]hortly after midnight on November 10, 2003, Maja Lint returned to the apartment she shared with Lint. Before going to bed, Maja Lint told Lint that she wanted to leave him. Lint begged Maja Lint not to leave, and he kept shaking her to keep her from falling asleep; Lint allowed her to sleep only after she agreed that they would be able to talk out their problem. When Maja Lint later awoke, however, she told Lint that she still wanted to leave. According to Maja Lint, Lint became angry, emptied her purse and took its contents, burned her passport and green card, and threatened to kill her and her family. He then tackled her to the floor, held her mouth and nose closed until she had difficulty breathing, and tied her up with belts and utility straps. He also shoved a sock into her mouth when he used the telephone, and he sprayed PAM cooking spray on the wall and carpet. He subsequently sprayed some cooking spray in the air and ignited it to demonstrate that the substance could cause a fire.
>
> Maja Lint explained that she wanted to save her life and decided to sweet talk Lint into having sexual relations with her. Lint agreed and removed her restraints. Thereafter, the couple engaged in sexual activities. Lint did not, however, let Maja Lint leave. He took her with him to the store to purchase cigarettes. She was barefoot and, when she tried to attract attention in the store, Lint became angrier. On the way home, Lint stopped at the drive-through windows of two restaurants. Maja Lint said that she was physically ill in the car and too afraid to try to escape. When they returned to the apartment, Lint bound Maja Lint again. He then fell asleep, and she tried to remove the restraints; Lint caught her and tightened the restraints. He also hung a hot clothing iron above her face. At one point during the lengthy ordeal, Lint tethered her to a television, which was hanging halfway over her head. According to Maja Lint, if she had moved, the television would have fallen onto her head. Maja Lint engaged in sexual relations with Lint on a second occasion in order to get him to untie her.
>
> While the couple was together in the apartment, Lint observed a

2

police car drive through the apartment complex. He apparently thought the police were after him, and he began to clean the apartment, moving the red utility straps into the laundry room. Lint also stayed near Maja Lint when she was unrestrained. He would not let her go to the bathroom alone, and he instructed her to sit in certain places. He threatened to kill her if she moved. When he later went to pick up a pizza, he made Maja Lint accompany him to the store.

On the night of November 10, 2003, according to Maja Lint, she struggled to stay awake, but she could not. She was awakened the next morning at 8:00 a.m. by a ringing telephone. Lint answered the telephone and spoke to Maja Lint's brother, telling him that she had left and that he did not know where she went. Lint fell asleep after taking the telephone call and Maja Lint, who was then unrestrained, was able to escape the apartment. She contacted the police and officers met her at a nearby gas station. They observed that Maja Lint's neck was red, and she was transported to the hospital. Maja Lint suffered lumps on her head, apparently from where Lint hit her, and she had miscellaneous bruising on her body, although she was unsure whether Lint caused this bruising. At trial, Maja Lint claimed that she was unable to tell anyone where she was during the lengthy ordeal and that she never gave Lint permission to restrain her. She also said that she continues to suffer nightmares and has been in counseling since the incident.

After Maja Lint spoke to the police, deputies went to Lint's apartment. They did not immediately locate Lint, but they found red straps in the laundry room and an iron in the bedroom. They also noticed insulation on the ground underneath an attic access. They climbed into the attic and followed footprint tracks through the insulation. The footprints led to a large, crude hole in the drywall between Lint's apartment and the neighboring apartment. Deputies found Lint in the attic of the neighboring apartment, hiding in the insulation. According to Linda May, the apartment manager, the hole in the drywall was not there previously, and the damage cost more than $1,000 to repair.

*People v. Lint*, No. 256743, 2005 WL 3179637, at *1-2 (Mich. Ct. App. Nov. 29, 2005).

## B. The Verdict, Sentence, and Direct Appeal

On May 28, 2004, a Macomb County Circuit Court jury found petitioner guilty of

kidnaping by secret confinement, Mich. Comp. Laws § 750.349, and malicious

destruction of property worth $1,000 or more, but less than $20,000, Mich. Comp. Laws

§ 750.377a(1)(b)(i).  The jury acquitted petitioner of the two criminal-sexual-conduct charges.  On June 30, 2004, the trial court sentenced petitioner to concurrent terms of seventeen and a half to forty years for the kidnaping conviction and three years, four months to five years for the malicious-destruction-of-property conviction.

In an appeal of right, petitioner argued that (1) he was denied due process by the jury instruction on secret confinement, (2) there was insufficient evidence to sustain the kidnaping verdict, (3) the prosecutor violated his right not to incriminate himself, (4) the trial court deprived him of due process by admitting evidence of other criminal activity, (5) the trial court failed to instruct the jury on the limited use of other "bad acts" evidence, (6) the prosecutor engaged in misconduct, (7) trial counsel was ineffective, (8) the sentence was outside the guideline range, (9) the sentence was based on facts that the prosecutor did not prove beyond a reasonable doubt, and (10) the cumulative effect of the errors deprived him of a fair trial.  The Michigan Court of Appeals affirmed petitioner's convictions in an unpublished, *per curiam* opinion.  *See People v. Lint*, No. 256743, 2005 WL 3179637 (Mich. Ct. App. Nov. 29, 2005).  On September 26, 2006, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Lint*, 477 Mich. 866 (2006) (table).

### C.  State Collateral Review

On September 25, 2007, Petitioner filed a motion for relief from judgment.  The motion alleged that (1) trial counsel was ineffective for failing to produce additional evidence, (2) the exclusion of a letter signed by Maja Lint deprived him of his right to present a defense, (3) trial counsel failed to communicate a plea offer, and (4) appellate counsel was ineffective for failing to raise these issues in the appeal of right.  The trial

4

court denied petitioner's motion in a reasoned opinion.  The Michigan Court of Appeals

denied leave to appeal on the ground that petitioner failed to establish entitlement to

relief under Michigan Court Rule 6.508(D).  *See People v. Lint*, No. 281800 (Mich. Ct.

App. Apr. 8, 2008).  On October 27, 2008, the Michigan Supreme Court denied leave to

appeal for the same reason.  *See People v. Lint*, 482 Mich. 1031 (2008) (table).

### D.  The Habeas Petition and Responsive Pleading

Petitioner filed his habeas corpus petition through counsel on January 7, 2009.

The grounds for relief read:

> I.      Petitioner's due process rights were violated where there
>         was insufficient evidence to prove his guilt of kidnaping by
>         secret confinement beyond a reasonable doubt.
>
> II.     Petitioner was denied due process of law by the admission
>         of "other acts" evidence that was irrelevant to the charge and
>         unfairly prejudicial.
>
> III.    Petitioner was denied his Sixth Amendment right to effective
>         assistance of counsel, and both the trial court and the
>         Michigan Court of Appeals erred in rejecting his claims to
>         that effect without holding the evidentiary hearing which he
>         requested.
>
> IV.     Petitioner was denied his right to a fair trial and the right to
>         present a defense by the trial court's exclusion of a letter
>         containing the signature of "Maja Lint."
>
> V.      Petitioner was denied due process of law by the trial
>         prosecutor's misconduct during closing argument.

Respondent John Prelesnik argues through counsel that:  (1) petitioner's first

claim (insufficient evidence) is not cognizable on habeas review because it challenges

the elements of the state-law offense rather than the level of evidence proving that

offense; (2) petitioner waived review of his second claim regarding "other acts"

evidence, and the claim is not cognizable on federal habeas review; (3) the state court correctly decided petitioner's ineffective-assistance-of-counsel claim; (4) petitioner's evidentiary claim is procedurally defaulted and not cognizable on habeas review; and (5) the prosecutor's conduct did not result in actual error and was not so flagrant as to render the entire trial fundamentally unfair.

Procedural default is not a jurisdictional limitation, *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010), and the Court finds it more efficient to address the merits of petitioner's claims than to analyze whether they were waived or are procedurally defaulted. The Court will proceed to address petitioner's claims on their merits, using the following standard of review.

## II.  Standard of Review

State prisoners are entitled to the writ of habeas corpus only if the state court's adjudication of their claims on the merits

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision

6

unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "[W]here factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct." *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011) (citing 28 U.S.C. § 2254(e)(1) and *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 786 (2011). To obtain a writ of habeas corpus from a federal court, a petitioner must show that the state court's decision "was so lacking in justification" that it resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

### III. Discussion

### A. Sufficiency of the Evidence

Petitioner alleges that there was insufficient evidence to sustain the jury's verdict on the kidnaping count under a secret-confinement theory. According to Petitioner, the secret-confinement element of the offense was not satisfied because, for significant periods of time, Ms. Lint had access to her cell phone, had an opportunity to inform

others of her predicament, and was not confined to her apartment.  The Michigan Court

of Appeals adjudicated this claim on the merits and concluded that the evidence was

sufficient for a rational trier of fact to determine beyond a reasonable doubt that

petitioner confined Maja Lint and intended to keep the confinement a secret.

### 1.  Clearly Established Law

The relevant question on habeas corpus review of a sufficiency-of-the-evidence

claim is

> whether, after viewing the evidence in the light most favorable to the
> prosecution, *any* rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt.  This familiar standard
> gives full play to the responsibility of the trier of fact fairly to resolve
> conflicts in the testimony, to weigh the evidence, and to draw reasonable
> inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal citation omitted) (emphasis in

original).  This standard "must be applied with explicit reference to the substantive

elements of the criminal offense as defined by state law."  *Id.* at 324 n.16.

To be guilty of secret confinement kidnapping, an accused must:

"1. Willfully, maliciously, and without legal authority[,]
"2. Secretly confine or imprison another person[,]
"3. By force/without consent."

*People v. Jaffray*, 445 Mich. 287, 305 (1994) (quoting 12 Michigan Practice, Criminal

Law, § 9.16, p 283).

"'Secret confinement' is not predicated solely on the existence or nonexistence of

a single factor.  Rather, consideration of the totality of the circumstances is required

when determining whether the confinement itself or the location of confinement was

secret, thereby depriving the victim of the assistance of others."  *Id.* at 309.  "[A]bsolute,

8

prolonged secrecy is not always required to sustain the charge; it is enough that

secrecy, or the attempt to maintain secrecy, denied the victim the opportunity to avail

himself of outside help." *Id.* at 307. "'Where the victim is isolated from others, by

physical force or threat of physical harm, courts have easily found sufficient evidence to

sustain a finding of secret confinement.'" *Id.* at 305 n.30 (quoting 12 Michigan Practice,

p 284).

### 2. Application

The Michigan Court of Appeals noted on review of petitioner's claim that

> Lint initially held his hand over Maja Lint's mouth and nose when he
> tackled her.  He later bound her and threatened her life.  When he was on
> the telephone, he placed a sock in her mouth.  Lint watched her closely,
> telling her where to sit and refusing to allow her to go to the bathroom
> alone.  He also lied to her brother about her location, and he never let her
> leave the apartment alone.

*Lint,* 2005 WL 3179637, at *3.

There was additional evidence that petitioner took Ms. Lint's shoes and her purse

with everything in it.  He burned her passport and "green card" so that no one could find

out who she was if she got away.  He tied her up and threatened to choke her and snap

her neck if she was not quiet, and he said that he intended to do everything he could to

keep her there and would kill her if she left.  He also threatened to kill her family, and he

flicked a lighter near cooking oil, which he sprayed on a wall, to show that the substance

would ignite.  (Tr. Mar. 26, 2004, at 27-35.)

Although petitioner took Ms. Lint to the party store, he would not let her put on

shoes, and when she tried to alert someone of her plight, petitioner became angry and

asked her what she was doing.  (*Id.* at 40-42.)   Later on, they went to a Kentucky Fried

9

Chicken restaurant and Burger King, but petitioner would not allow her to get out of the car, and she was afraid to leave.  They also left the apartment to get a pizza.  Ms. Lint testified that she thought about running away then, but she was not wearing shoes.  (*Id.* at 90-93.)

Back at their apartment, petitioner tied her up again, and when she managed to free her hands, petitioner tied the straps tighter and suspended an iron over her.  He eventually took the iron down and said they had to clean the apartment because there were police cars in the area and he did not want the police to find anything wrong with the apartment.  He also attached a television to her and threatened to make the television fall on her head.  (*Id.* at 43-51.)

Ms. Lint testified that she considered leaving, but stayed at home because she could not get away from petitioner and because he would not let her do anything unless he was standing next to her.  Although she grabbed a cell phone, wallet, and car keys on the day of her escape, she claimed that petitioner had previously taken the phone away from her and that she did not have the cell phone during the incidents.  She maintained that she had no way of contacting anyone.  *(Id.* at 54, 56, 60-61, 66-67.)

A rational trier of fact could have concluded from the evidence taken in the light most favorable to the prosecution that petitioner isolated Ms. Lint against her will by force or threat of force and that he lacked legal authority to secretly confine her. Although the facts may have been susceptible to a different interpretation, "[u]nder the *Jackson v. Virginia* standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" *United States v. Fisher*, __ F.3d __, __, 2011 WL 2802924, at *7 (6th Cir. July 19, 2011)

10

(quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)).

The state appellate court's decision was an objectively reasonable application of *Jackson*.   Petitioner therefore has no right to relief on the basis of his challenge to the sufficiency of the evidence.

### B.  Other Acts Evidence

Petitioner alleges that he was denied due process of law by the admission of prejudicial "other acts" evidence.   The disputed evidence came to light when defense counsel asked Ms. Lint about her complaint for an annulment of her marriage to petitioner.   The prosecutor objected to this line of questioning and argued that the entire complaint for an annulment should be admitted under Michigan Court Rule 106, the rule of completeness.   The trial court agreed with the prosecutor and admitted the document, which stated that petitioner:  fled the scene of a vehicular accident, which he caused; forced Ms. Lint to inform the police that she was driving the vehicle; was arrested for an outstanding warrant stemming from a charge of driving while his license was suspended; and in October of 2003, spent twenty-four days in jail for violating the conditions of probation.   Petitioner asserts that this evidence was irrelevant to the charges, was an assault on his character, and deprived him of due process.

The Michigan Court of Appeals determined that petitioner waived review of all evidentiary issues related to the challenged testimony because he chose to introduce the evidence through counsel and used the evidence to sustain his defense theory. This Court finds no merit in petitioner's claim because

> [t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence . . . .   While the Supreme Court has addressed

11

whether prior acts testimony is permissible under the Federal Rules of
Evidence, *see Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644,
136 L. Ed.2d 574 (1997); *Huddleston v. United States*, 485 U.S. 681, 108
S. Ct. 1496, 99 L. Ed. 2d 771 (1988), it has not explicitly addressed the
issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003); *see also Bey v. Bagley*, 500

F.3d 514, 523 (6th Cir. 2007) (concluding that the petitioner's disagreement with the

state court's ruling on "other acts" evidence involved no constitutional dimension and,

therefore, was not cognizable on federal habeas review).  As no Supreme Court

decision bars the use of propensity evidence on constitutional grounds, the state courts'

rejection of this claim was not contrary to Supreme Court precedent.

### C.  Trial Counsel

Petitioner alleges that he was denied his Sixth Amendment right to effective

assistance of counsel.  Specifically, petitioner claims that defense counsel:  (1) failed to

file a witness list; (2) failed to object to the prosecutor's improper closing argument; (3)

introduced evidence of petitioner's other "bad acts" and failed to request a limiting

instruction on the evidence; (4) failed to object to the jury being instructed on secret

confinement kidnaping; (5) failed to introduce witness testimony and documentary

evidence; and (6) failed to inform him of the prosecutor's plea offer.   Petitioner further

alleges that the state courts erred by rejecting his ineffective-assistance-of-counsel

claim without holding an evidentiary hearing.  The Michigan Court of Appeals on direct

review and the trial court on state collateral review adjudicated various aspects of

petitioner's claims.  Both courts concluded that petitioner was not denied effective

assistance of counsel.

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984),

12

is clearly established federal law.  *Cullen v. Pinholster*, __ U.S. __, __, 131 S. Ct. 1388,

1403 (2011).  Under *Strickland*, an attorney is constitutionally ineffective if "counsel's

performance was deficient" and "the deficient performance prejudiced the defense."

*Strickland*, 466 U.S. at 687.  To establish deficient performance, a habeas petitioner

must show "that counsel made errors so serious that counsel was not functioning as the

'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.*  "Judicial scrutiny of

counsel's performance must be highly deferential."  *Id.*, 466 U.S. at 689.

To demonstrate that counsel's performance prejudiced the defense, a habeas

petitioner must show "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different."  *Id.* at 694.  "This does

not require a showing that counsel's actions 'more likely than not altered the outcome,'"

but "[t]he likelihood of a different result must be substantial, not just conceivable."

*Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).  "The

standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when

the two apply in tandem, review is 'doubly' so."  *Id.* at 788 (internal and end citations

omitted).

### (1) Failure to File a Witness List

Petitioner alleges that defense counsel's failure to file a witness list resulted in

the trial court limiting the scope of the witnesses' testimony to impeachment evidence.

The record, however, belies petitioner's claim.  At the close of the prosecution's case,

defense counsel announced his intention to call two witnesses.  The prosecutor

objected on the ground that the witnesses were alibi witnesses and that defense

counsel had not provided him with either an alibi notice or a witness list.  Defense

counsel insisted that the witnesses were not alibi witnesses and that his sole purpose in producing them was to rebut the complainant's testimony. (Tr. May 27, 2004, at 70-76.)

Defense counsel pointed out to the trial court that he could not have known which witnesses to call in rebuttal until after the complainant testified. This is an indication that trial counsel's failure to file a witness list was a matter of trial strategy. He subsequently elicited the limited testimony that he planned to elicit. The lack of a witness list did not limit his scope of his witnesses' testimony.

### (2) Failure to Object to the Prosecutor's Arguments

Petitioner claims that his trial attorney should have objected to the prosecutor's improper closing argument, but the disputed remarks were not improper, and even if they were improper, they were not flagrant. *See, infra,* section III.E. The trial court, moreover, instructed the jurors that the attorneys' arguments were not evidence, but only meant to help them understand the evidence. (Tr. May 28, 2004, at 88-89.) Therefore, trial counsel's failure to object did not prejudice petitioner.

### (3) Introduction of "Bad Acts" Evidence

Petitioner faults his trial attorney for introducing evidence of petitioner's other "bad acts" and for failing to request a cautionary jury instruction on the evidence. The Michigan Court of Appeals determined that petitioner had no right to complain about the admission of the evidence because defense counsel introduced the evidence as a matter of trial strategy after the trial court ruled that the complaint for an annulment would be admitted into evidence.

The disputed evidence consisted of allegations in the annulment complaint that petitioner fled the scene of a vehicular accident, forced Ms. Lint to inform the police that

she was driving the vehicle, was arrested for an outstanding warrant, and was jailed for violating the conditions of probation.  Defense counsel questioned Ms. Lint about the annulment complaint, in an attempt to challenge Ms. Lint's credibility and, apparently, to show that the criminal charges were motivated by her anger toward petitioner.  Defense counsel's initial question was limited to asking whether one of Ms. Lint's grounds for annulment was that petitioner had lied to her by claiming he would receive two million dollars from his grandfather when he married Ms. Lint.  (Tr. May 26, 2004, at 141.)  After the prosecutor convinced the trial court to admit the entire annulment complaint, defense counsel elicited testimony about Ms. Lint's other grounds for an annulment.  This included the "bad acts" evidence in question here.  (*Id.* at 153-55.)

Petitioner concedes that defense counsel elicited this evidence in the first instance to minimize its impact after the trial court ruled that the entire complaint could be admitted in evidence.  *See* Pet. for Writ of Habeas Corpus, Attachment B at 3, n.3.  Thus, it is clear that defense counsel's tactic in eliciting the evidence was a matter of trial strategy.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."  *Strickland*, 466 U.S. at 690.  And even though defense counsel could have requested a cautionary jury instruction on other "bad acts" evidence, the fact that petitioner was acquitted of the two criminal-sexual-conduct charges is an indication that the jury was not persuaded to convict petitioner solely on the basis of other "bad acts" evidence.  Counsel's allegedly deficit performance did not prejudice the defense.

### (4) Failure to Object to the Jury Instruction on Kidnaping

Petitioner claims that trial counsel should have objected to the jury being

15

instructed on secret-confinement kidnaping.  The criminal information charged petitioner with forcible confinement, and petitioner maintains that the evidence was insufficient to establish the alternative theory of secret confinement.

The Michigan Court of Appeals determined that the trial court properly instructed the jury.  The Court of Appeals noted that the kidnaping statute sets forth alternative theories for kidnaping and that the jury instructions properly included the elements of the crime and did not exclude consideration of material issues, defenses, or theories for which there was supporting evidence.  The state court's interpretation of state law binds this Court.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Israfil v. Russell,* 276 F.3d 768, 771 (6th Cir. 2001) ("Principles of comity require federal courts to defer to a state's judgment on issues of state law . . . .").

The evidence, moreover, supported the charge of secret-confinement kidnaping, *see, supra*, section III.A., and, as the Michigan Court of Appeals recognized, "the parties knew at all times that the kidnapping charge was based on a theory of secret confinement."  *Lint*, 2005 WL 3179637, at *10.  The Court therefore finds that defense counsel was not ineffective for failing to object to the jury instruction on secret-confinement kidnaping.

**(5) Failure to Introduce Witness Testimony and Documentary Evidence**

Petitioner argues that defense counsel should have introduced witness testimony and documentary evidence demonstrating that Ms. Lint was not held against her will. Petitioner contends that telephone records would have shown that several telephone calls were made from the Lints' telephone to Serbia and Montenegro (Ms. Lint's homeland), to Ms. Lint's mother, and to Farmington Hills and Southfield on November

16

10, 2003.  Other telephone records allegedly establish that calls were made to Ms.

Lint's brother and her mother on November 10, 2003, and that Ms. Lint's mother called

the Lints that day.  Additionally, alleges Petitioner, witnesses could have established

that, contrary to Ms. Lint's testimony, the telephone cord in the apartment was not cut

and there were blinds on the bedroom window.

"In any ineffectiveness case, a particular decision not to investigate must be

directly assessed for reasonableness in all the circumstances, applying a heavy

measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.  The duty

to investigate "includes the obligation to investigate all witnesses who may have

information concerning his or her client's guilt or innocence."  *Towns v. Smith*, 395 F.3d

251, 258 (6th Cir. 2005).  "The relevant question is not whether counsel's choices were

strategic, but whether they were reasonable."  *Roe v. Flores-Ortega*, 528 U.S. 470, 481

(2000).  Attorneys "may draw a line when they have good reason to think further

investigation would be a waste."  *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

The telephone records do not show who made the calls, to whom they were

made, or who received the calls.  Furthermore, defense counsel produced petitioner's

sister, Amanda Lint, who testified that she called the Lints at 10:30 p.m. on November

10 and talked to Ms. Lint and that Ms. Lint called her at 12:30 a.m. that night.  (Tr. Mar.

27, 2004, at 80-84.)  Defense counsel also produced petitioner's cousin, Christy

Dickenson, who testified that she saw Ms. Lint for about half an hour on the day before

petitioner was arrested.  (Tr. Mar. 27, 2004, at 87-91.)  Defense counsel was not

ineffective for failing to introduce cumulative evidence that Ms. Lint communicated with

people during her alleged confinement.  *See Winfield v. Roper*, 460 F.3d 1026, 1033

17

(8th Cir. 2006) (concluding that the decision not to call witnesses was not only reasonable trial strategy, but that the missing witnesses' testimony would have been cumulative to what was introduced).

As for blinds on the bedroom window, defense counsel cross-examined Ms. Lint about the window blinds, and Ms. Lint admitted that she may have testified at the preliminary examination that the blinds were open, not that they did not exist.  (Tr. Mar. 26, 2004, at 115-17.)  Also, Deputy Sheriff John Allor testified that, when he went to the Lints' apartment on November 11, 2003, the shade was drawn on the bedroom window. (Tr. Mar. 27, 2004, at 46.)  Defense counsel emphasized this testimony during closing arguments.  (Tr. Mar. 28, 2004, at 55.)  Thus, the jury was made aware of the possibility that Ms. Lint testified incorrectly about the lack of window blinds in the bedroom.

Petitioner claims that defense counsel should have produced evidence to contradict Ms. Lint's testimony that the telephone wires were cut.  Ms. Lint testified that the phone cord "was cut off."  (Tr. Mar. 27, 2004, at 96.)  The jury could have interpreted this comment to mean that the telephone cord was disconnected, as opposed to sliced.  Therefore, even if defense counsel could have shown that the telephone cord was intact, the evidence would not necessarily have contradicted Ms. Lint's testimony.

### (6) Failure to Convey a Plea Offer

Petitioner alleges that, after his conviction, his trial attorney notified him for the first time that the prosecutor had offered him a plea bargain.  According to petitioner, the proposed plea bargain would have required him to plead guilty to kidnaping in return for a sentence of four to eight years.  Petitioner states that he would have accepted the

prosecutor's offer if his attorney had informed him of the offer before trial.

### a.  Legal Framework

"[A] defense attorney's failure to communicate a plea offer to his or her client constitutes deficient performance as a matter of law."  *Guerrero v. United States*, 383 F.3d 409, 416 (6th Cir. 2004) (citing *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003)); *see also Satterlee v. Wolfenbarger*, 374 F. Supp.2d 562, 567 (E.D. Mich. 2005) ("A defense attorney's failure to notify his client of a prosecutor's plea bargain offer constitutes defective performance, for the purpose of a claim of ineffective assistance of counsel.")  Therefore, if petitioner can show that the prosecutor extended a plea offer and that his attorney failed to communicate the offer to him, he will have established the performance prong of the *Strickland* test.  *Guerrero*, 383 F.3d at 416.  "[A] petitioner may establish the requisite prejudice by demonstrating a 'reasonable probability' that if he had been notified of the plea offer, he would have accepted it."  *Id.* (citing *Griffin*, 330 F.3d at 737, *Magana v. Hofbauer*, 263 F.3d 542, 547-48 (6th Cir. 2001), and *Turner v. Tennessee*, 858 F.2d 1201, 1206 (6th Cir. 1988)).

### b.  Application

Petitioner submitted affidavits regarding the purported plea bargain to the trial court.  Petitioner's affidavit states that his trial attorney informed him after trial that a plea had been offered before trial and that he (the trial attorney) had rejected it outright without consulting petitioner.  Petitioner's mother states in an affidavit that she and her husband spoke to petitioner's attorney during trial and that the attorney had said there was a plea offer from the prosecutor, but that he rejected the offer and that they did not want to hear the offer.   Petitioner's father has signed a similar affidavit.  The trial court

19

reviewed these affidavits and concluded that they were "rank hearsay" because each affiant relied on what trial counsel allegedly said about the prosecutor's statements to him.

"Rank hearsay" "is no evidence at all" and "no basis to provide federal habeas relief." *Beachem v. Williams*, 351 F. Supp.2d 793, 817-18 (N.D. Ill. 2004) (citing *United States v. Godinez*, 110 F.3d 448, 456 (7th Cir. 1997) (citing Fed. R. Evid. 802)). Even if the Court were to accept the affidavits as evidence, it is unlikely that petitioner was unaware of a plea offer until after the trial, because his parents supposedly learned of an offer before or during trial. It is also unlikely that the terms of the plea offer were as favorable as petitioner alleges they were, given his parents' statement that trial counsel had said they did not want to hear the offer. The implication was that the offer was not worth mentioning.

Petitioner claims that he was unable to develop the facts in state court because the state courts denied his motions for an evidentiary hearing. However, Petitioner first raised his claim about the plea offer when he filed his motion for relief from judgment. Habeas relief may not be granted "for alleged deficiencies in a state's post-conviction procedures," *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002) (citing *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986)), and, "[a]s a rule, a prisoner has no federal constitutional right to an evidentiary hearing on a post-conviction petition that he files in state court." *United States ex rel. Willhite v. Walls*, 241 F. Supp. 2d 882, 890 (N.D. Ill. 2003) (citing *Zamora v. Pierson*, 158 F. Supp.2d 830, 835 (N.D. Ill. 2001)).

This Court declines to hold an evidentiary hearing because its review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that

adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S. Ct. at 1398.  In other

words, "[i]f [petitioner] is to 'overcome the limitation of § 2254(d)(1),' []he must do so 'on

the record that was before the state court.'" *Bray v. Andrews*, 640 F.3d 731, 737 (6th

Cir. 2011) (quoting *Cullen v. Pinholster*, 131 S. Ct. at 1400).

No plea offer was mentioned on the record in state court.  Petitioner therefore

has failed to demonstrate that the prosecution actually made a plea offer to him through

counsel, that the offer consisted of a sentence of four to eight years in return for

pleading guilty to kidnaping, and that counsel rejected the offer without consulting

petitioner.  The Court therefore rejects the contention that defense counsel was

ineffective for failing to convey a plea offer to petitioner until after trial.

### 7.  Summary

Petitioner has not shown that his attorney's performance was deficient and that

the deficient performance prejudiced the defense.  Accordingly, the state courts'

adjudications of petitioner's ineffective-assistance-of-counsel claims were not contrary

to, or an unreasonable application of, *Strickland*.

### D.  The Right to Present a Defense

Petitioner claims that he was denied his right to a fair trial and his right to present

a defense when the trial court prohibited him from admitting in evidence a letter

containing the signature of "Maja Lint."  In the letter, Ms. Lint allegedly wrote that:

> [Police Officer] McFadden came into the situation and made it seem worst
> [sic] than it really was and then he asked me to just go along with it[,] that
> you deserved it.

> [T]here is no way that I can do anything about it, because I was told if I
> ever did that they would get me for a false police report, and I would get in
> trouble and get deported, and you know I can never go back to Bosnia.

21

According to petitioner, the letter suggests that Ms. Lint was persuaded to falsely exaggerate petitioner's conduct and to perpetuate untruthful allegations about him in order to avoid prosecution and deportation.

Petitioner first raised this issue in his motion for relief from judgment. The trial court adjudicated the claim on the merits and determined that exclusion of the letter could only have been harmless error.

### 1.  Clearly Established Federal Law

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)), but "[a] defendant's right to present relevant evidence is not unlimited . . . ." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). The right "is subject to reasonable restrictions." *Id.*

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. . . . [T]he Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.

*Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (quotation marks and citations omitted) (end bracket in original).

Furthermore, the right to present a defense is subject to harmless-error analysis. *See Fleming v. Metrish*, 556 F.3d 520, 536-37 (6th Cir.), *cert. denied*, __ U.S. __, 130 S. Ct. 103 (2009). On federal habeas corpus review, a constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's

verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)).  This standard applies whether or not the state court recognized the error and reviewed it for harmlessness.  *Fry v. Pliler,* 551 U.S. 112, 121-22 (2007).

## 2.  Application

On cross-examination of Maja Lint, defense counsel asked Ms. Lint for a handwriting sample.  Defense counsel was trying to establish that Ms. Lint had written the letter in question.  The prosecutor objected, and the trial court stated that there would be no comparison, because neither the court, nor the jury, were handwriting experts.  In the jury's absence, Ms. Lint stated that the signature at the bottom of the letter was not hers and that the writing was not her handwriting.  The trial court ruled that defense counsel could not introduce the letter through Ms. Lint.  (Tr. May 26, 2004, at 73-76.)

At the end of the day, the trial court revisited the issue.  The trial court stated that it would not permit defense counsel to admit the letter because the document was hearsay and because Ms. Lint had claimed that the signature was not her signature. The court stated that it would admit the document in evidence if defense counsel produced an expert witness and proved that the signature was Ms. Lint's signature. However, when defense counsel asked for an adjournment of a few days to acquire an expert witness, the trial court denied the request.  (*Id.* at 185-89.)

Petitioner claims that the letter would have shown that the police tried to persuade Ms. Lint to exaggerate petitioner's conduct and to perpetuate untruthful allegations about him in order to avoid prosecution and deportation.  The trial court,

23

however, stated in her order denying petitioner's motion for relief from judgment that defense counsel could have questioned Ms. Lint about the contents of the letter and asked her whether she felt compelled to prosecute petitioner.  The trial court also correctly noted that defense counsel was permitted to establish an ulterior motive by questioning Ms. Lint about her annulment complaint.

This Court concludes that the refusal to admit the letter did not deprive petitioner of his right to present a defense.  Trial counsel could have cross-examined Ms. Lint about the letter or he might have been able to introduce the letter through another witness.  Even if the trial court had admitted the letter, the letter would not have had a substantial and injurious effect or influence on the jury's verdict because Ms. Lint claimed that she did not write it.  Thus, the alleged denial of the right to defend was harmless.

### E.  The Prosecutor's Conduct

Petitioner's fifth and final claim alleges that the prosecutor deprived him of due process of law during closing arguments.  Petitioner asserts that the prosecutor (1) shifted the burden of proof and unfairly commented on his right not to testify, (2) accused him of stealing and being a bad actor and made repeated references to the fact that petitioner had spent time in jail, (3) argued facts not in evidence, (4) invoked a biblical passage, and (5) misled the jury on the admissibility of evidence.

The Michigan Court of Appeals reviewed some of these claims for "plain error" because petitioner failed to preserve the claims for appellate review by objecting at trial. The Court of Appeals reviewed the other claims to determine whether petitioner was denied a fair and impartial trial.  The Court of Appeals ultimately concluded that

24

petitioner was not entitled to relief on the basis of his prosecutorial-misconduct claim.

### 1. Clearly Established Law

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). To prevail on his claim, Petitioner must demonstrate that the prosecutor's remarks infected the trial with such unfairness "as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

Courts in this Circuit employ a two-prong test for determining whether prosecutorial misconduct rendered a trial fundamentally unfair. *Slagle v. Bagley*, 457 F.3d 501, 515 (6th Cir. 2006) (citing *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). First, a court asks whether the prosecutor's conduct or remarks were improper. *Id*. at 516. Second, if the conduct or remarks were improper, a reviewing court must consider the following four factors to determine whether the improper acts were so flagrant as to warrant reversal:

> (1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally.

*Id.* Claims of prosecutorial misconduct also are subject to harmless-error analysis. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003).

### 2. Application

### a. Commenting on Petitioner's Failure to Testify

Petitioner alleges that the prosecutor shifted the burden of proof and unfairly

commented on his right not to testify when he stated that defense counsel did not refute anything and that defense counsel did not call witnesses, including nurses and Ms. Lint's brother, who were available to him.  (Tr. Mar. 28, 2004, at 18-19, 81.)  The Michigan Court of Appeals concluded on review of this claim that the prosecutor's remarks were a fair response to defense counsel's closing argument and that no prejudice resulted.

A prosecutor may not shift the burden of proof to the defendant, *Patterson v. New York*, 432 U.S. 197, 215 (1977), or "suggest that the defendant ha[s] the burden of proof or any obligation to produce evidence to prove his innocence."  *Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006) (quoting *United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993)).  Nor may a prosecutor use a defendant's decision to remain silent as substantive evidence of guilt. *Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009).

Although the prosecutor did say that "almost all of the evidence we heard from Mia (sic) Ling is completely uncontroverted" (Tr. May 28, 2004, at 18-19), "there was nothing improper about highlighting uncontroverted testimony before the jury."  *United States v. Kuehne*, 547 F.3d 667, 690 (6th Cir. 2008).  The prosecutor did not suggest that petitioner had the burden of proving his innocence.  The trial court, moreover, cautioned the jury during the prosecutor's argument and at the conclusion of the trial that the prosecutor had the burden of proof and that petitioner did not have to prove his innocence or do anything.  (Tr. Mar. 28, 2004, at 84, 87.)

The remarks about defense counsel being able to call witnesses were made in response to defense counsel's closing argument that the prosecution had failed to produce certain evidence and witnesses.  The prosecutor was entitled to wide latitude in

26

rebuttal argument and to fairly respond to defense counsel's arguments.  *Angel v.*

*Overberg*, 682 F.2d 605, 607-08 (6th Cir. 1982) (en banc)).  For these reasons, the

Court concludes that the prosecutor's comments were not improper and certainly not

flagrant.

### b.  Comments about Petitioner

Petitioner asserts that the prosecutor committed misconduct when he accused

petitioner of stealing and being a bad actor and made repeated references to the fact

that petitioner had spent time in jail.  The Michigan Court of Appeals stated that reversal

was not required because the prosecutor was merely explaining the evidence and the

situation that existed between the parties and was rebutting the defense theory of the

case.

A prosecutor may not "dwell[] on a defendant's bad character to prove that he or

she committed the crime charged."  *Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir.

2008), *cert. denied*, __ U.S. __, 129 S. Ct. 1991 (2009).  The comments in dispute read

as follows:

> [Ms. Lint] had the optimism of youth.  She believed she'd get
> married and live happily ever after and then reality hits. . . .  It doesn't turn
> out the way she plans it does.  Like all of us human beings, we enter into
> things, they don't work out the way we want.  They backfire on us.  Do you
> run around and tell people about it?  The guy she loves, the guy she
> boasted about, steals her money.  We heard testimony that fifty thousand
> dollars was taken on charge cards.  Fifty thousand in two months of their
> marriage.  Fifty thousand dollars!  He's in and out of jail, or her testimony
> to that effect.  Fights pretty constant.
>
> Need I ask you, given that scenario and given that short time frame,
> what did we hear from her?  I asked her did you love him?  Oh, yes.
> She's in love with him.  She had good times with him.  And she's the first
> one to assert, I don't believe it, but I wasn't there and it's – it's up to her to
> tell us if she loved this man.  But, you know, after stealing, bad actor, fibs

about assets, and jail in a short marriage and dreams shattered.  Because only a 20-year old could have those dreams and only those can be shattered.  We've all had our dreams taken on a little bit and we don't take them so seriously.

(Tr. May 28, 2004, at 16-17.)

The jury had already heard about petitioner's misuse of Ms. Lint's credit cards, as well as his comment about inheriting two million dollars when he married Ms. Lint and the fact that he had been to jail.  Additionally, Ms. Lint testified that she had wanted to leave petitioner because there was dishonesty in their marriage, she "was lied to all the time," and she was tired of petitioner's lying and cheating  (Tr. May 26, 2004, at 25 and 105.)  The prosecutor's comments were a reflection on the evidence and inferences drawn from the evidence.  They were not improper.

### c.  Arguing Facts Not in Evidence

Petitioner contends that the prosecutor argued facts not in evidence when he stated that victims of domestic violence return to their abusers over and over again.  (Tr. Mar. 28, 2004, at 76-77.)   The Michigan Court of Appeals stated that the prosecutor's argument was a fair response to defense counsel's closing argument and that it was not improper because it was merely an attempt to appeal to the jurors' common sense.

"It is improper for a prosecutor to argue facts not in evidence." *Abela v. Martin*, 380 F.3d 915, 929 (6th Cir. 2004) (citing *Berger v. United States*, 295 U.S. 78 (1935)). Here, however, the prosecutor's comment about victims of domestic violence was an isolated one, and it was made in response to defense counsel's argument that Ms. Lint visited petitioner in jail at least three times despite claiming that she had feared for her life.  (Tr. Mar. 28, 2004, at 59.)  The prosecutor's response to defense counsel's

28

argument  was not improper.

### d.  Quoting from the Bible

During his closing argument, the prosecutor stated that "the wicked hide their faces while the righteous are bold as a lion." (*Id.* at 30.)  Petitioner claims that the remark was an improper quote from the Bible.  *See* Proverbs 28:1.  The Michigan Court of Appeals declined to review this claim because, in its opinion, petitioner abandoned the claim by giving it cursory treatment and by failing to explain or rationalize his position.

This Court finds that the prosecutor's comment was the equivalent of saying that the jury could infer guilt from the fact that petitioner hid from the police.  It would have been improper to quote the Bible as authoritative proof that evidence of flight creates a legal presumption of guilt; but, "the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt." *Allen v. United States*, 164 U.S. 492, 499 (1896) (citing Whart. Hom. § 710; *People v. Pitcher*, 15 Mich. 397 (1867)); *see also United States v. Wimbley,* 553 F.3d 455, 462 (6th Cir.) (recognizing "that a defendant's flight is evidence allowing an inference of guilty knowledge"), *cert. denied*, __ U.S. __, __, 129 S. Ct. 2414 (2009).  The jurors, moreover, had already heard a police officer's testimony that petitioner was hiding in the attic when the police went to the Lints' apartment.  "[T]he prosecutor's single mention of petitioner's flight – which the jurors were already aware of due to evidence presented earlier in the trial" did not "constitute[] error or affect[] the proceedings in any way." *Id.* Thus, petitioner's claim lacks merit.

### e.  Commenting on the Admissibility of Evidence

29

Defense counsel stated during his closing argument that the prosecutor had failed to produce Ms. Lint's brother and certain evidence, such as medical records, credit card statements, counseling records.  (Tr. May 28, 2004, at 60-61.)  In his rebuttal argument, the prosecutor attempted to explain why he had not called Ms. Lint's brother or introduced credit card bills.  The prosecutor then said,

> There are rules of evidence. . . . The  judge makes rulings on them.  Can't always bring in every thing we want to bring in.  You saw how hard it was to get in the photos.  Couldn't get those in.  That's something that happened.  But to say why didn't we have this and why didn't we have that, is disingenuous.  And he knows it, because there's a lot that we have and don't have or can't have . . . .

(Tr. May 28, 2004, at 81-82.)

Petitioner argues that, because the trial court did not exclude the evidence to which to which defense counsel was referring, the prosecutor's comments misled the jury into thinking that the trial court had refused to admit the evidence.  The Michigan Court of Appeals determined that the prosecutor's argument was true and a fair response to defense counsel's closing argument.

This Court agrees with the Michigan Court of Appeals that the prosecutor's argument was a proper response to defense counsel's argument regarding the prosecutor's failure to produce certain witnesses and evidence.  The prosecutor, moreover, acknowledged that there were things he had not been able to produce, and the trial court explained in its preliminary instructions to the jury that one of its responsibilities was to make decisions about evidence.  (Tr. May 25, 2004, at 80.)  The prosecutor's argument could not have misled the jury.  Therefore, petitioner has no right to relief on the basis of the prosecutor's argument.

30

### 3.  Summary

The prosecutor's remarks during closing arguments were either proper or not so flagrant as to require reversal.  Furthermore, the trial court instructed the jurors that the attorneys' closing arguments were not evidence.  (*Id.* at 80; Tr. May 28, 2004, at 88-89.) A trial court generally can correct improprieties in a prosecutor's closing argument "by instructing the jury that closing arguments are not evidence."  *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (citing *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001)).  The Court therefore declines to grant the writ on the basis of the prosecutor's closing argument.

## IV.  Conclusion

The state courts' rejection of petitioner's claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts.  Petitioner was "entitled to a fair trial but not a perfect one," *Lutwak v. United States*, 344 U.S. 604, 619 (1953), and the state court decisions in this case were not  "so lacking in justification" that they resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. at 786-87.   Accordingly, the petition for a writ of habeas corpus [Dkt. #1] is **DENIED**.

The Court nevertheless **GRANTS** a certificate of appealability on claim three (ineffective assistance of counsel) because reasonable jurists could debate whether the issue should have been resolved differently.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The Court declines to grant a certificate of appealability on the remaining claims because reasonable jurists would not find the Court's assessment of those claims

31

debatable or wrong, nor conclude that the issues deserve encouragement to proceed

further. *Id.*

Dated: July 29, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 29, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk